### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHELLEY MARKLE,

            Plaintiff,

      v.

DRUMMOND ADVISORS, LLC
and SEAN BARRY,

            Defendants.

Case No. 19-cv-02789

Judge John Robert Blakey

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Shelley Markle sues her former employer, Drummond Advisors, LLC ("Drummond") for unpaid overtime wages pursuant to the Fair Labor Standards Act, 29 U.S.C. § 207 (Count I), and she sues Drummond and its president, Sean Barry, for unpaid overtime under the Illinois Minimum Wage Law, 820 Ill. Comp. Stat. 105/4a (Count II). [98]. The parties have cross moved for summary judgment [133], [143]. Plaintiff also moves to strike [140] portions of Barry's answer and affirmative defenses. For the reasons explained below, the Court grants Defendants' motion for summary judgment [133], denies Plaintiff's motion for summary judgment [143], and denies as moot Plaintiff's motion to strike [140].

## I. Factual Background[1]

From April 3, 2017 to December 3, 2018, Plaintiff Shelley Markle worked as a Project Manager for Drummond, a company operating in the construction industry.

---

[1] The Court draws the facts from the parties' Rule 56.1 Statements of Fact, Statements of Additional Facts, responses thereto, *see* [135], [145], [146], [147], [149], [158], [159], [160], and from the factual record for disputed issues.

[146] ¶¶ 1–2.  Defendant Sean Barry serves as the President and sole member of Drummond.  *Id.* ¶ 2.

Broadly speaking, Drummond's business manages and delivers "completed constructions projects" for "clients" who own commercial and residential buildings. *Id.* at ¶ 7.  Drummond's clients are primarily (or entirely) LLCs that own the commercial and residential properties.  In turn, the LLCs' membership consists of real estate investors who jointly purchased the properties.  Defendant Barry is a member of some of the LLCs, as are some of his family members, as well as other individuals and legal entities (some of which Barry controls).  [135-4] at 13:13–21:1.

Various aspects of the LLC-owned properties and Drummond's business also involved some of the other investors.  For example, investor Robert Purcell owns Timberwolf Contracting, a general contracting and masonry company that served as the general contractor for the construction projects on some of the LLCs; two other investors—lawyers Kathleen Boychuck (Barry's sister) and Gerald Walsh—would handle legal issues on the projects and for Drummond.  *Id.* at 13:20–15:3, 53:7–11. Another investor, PR Assets, provided accounting, insurance, and human resources services to Drummond.  *Id.* at 13:13–24, 52:11–53:2.  As Defendant Barry describes it, he and his fellow investors "are really creative with some of our ownerships" of the properties in which they invest.  *Id.* at 36:6–7.

During Plaintiff's time as a Project Manager for Drummond, she worked on two construction projects at properties in Park Ridge, Illinois: (1) a $6 million renovation of an office building at 14 Main Street owned by Prairie Main LLC; and

(2) a smaller project at a residential apartment building at 1900 Oakton Street owned by 1900 Oakton LLC. [146] ¶¶ 4–6. Defendant Barry was a member of both these LLCs, as were some of the other investors identified above. [146] ¶ 3.

Although the parties disagree on some of the details of Plaintiff's duties, particularly regarding how much autonomy and discretion she had, [146] ¶¶ 27, 33, 62, they agree on other aspects. For example, they agree that Plaintiff's job involved managing contractors and the work they completed—at 14 Main Street, she coordinated about 30 different trades. *Id.* ¶ 46. This included scheduling the subcontractors according to the overall needs of the project, *id.* ¶ 46; inspecting work and determining whether it matched drawings and plans, *id.* ¶ 23; and monitoring workplace safety. *Id.* ¶ 54. In her role, she also had "general control" over the workplace such that she could instruct workers to leave if they did not follow safety protocols. *Id.* She also had budgetary and financial responsibilities, including communicating with vendors and "making sure that the right material showed up at the right time." *Id.* ¶ 49. In addition, Plaintiff also communicated with prospective contractors, solicited and helped finalize bids from these prospective contractors, and drafted certain scope of work agreements. *Id.* ¶¶ 31, 38. She also scheduled government inspections and ensured that the jobsite was ready for those inspections. *Id.* ¶ 25.

Drummond paid Plaintiff's compensation on a salaried basis, starting at $90,000 per year in 2017 and increasing to $93,601.30 in 2018. [146] ¶¶ 5, 17. She also received an annual bonus and paid vacation time. *Id.* ¶ 17. At the time

Drummond hired her, it told her that her salary would correspond to 45 hours of work per week, [146] ¶ 17, but she alleges that she routinely worked more, *id*. ¶¶ 24–25. Because human resources determined that her position remained exempt from overtime, Plaintiff received no additional compensation for any overtime work. *Id*. ¶¶ 17, 74.

In December 2018, Drummond terminated Plaintiff.[2] *Id*. ¶ 1. Thereafter, she filed this suit, alleging that Drummond misclassified her as an exempt employee and failed to pay her overtime in violation of the Fair Labor Standards Act (FLSA) and the Illinois Wage Payment Collection Act (IWCA). [98]. Plaintiff brings her FLSA claim against Drummond and her IWCA claim against both Drummond and Sean Barry. *Id*.

Defendants now move for summary judgment, arguing that the evidence indisputably shows that Drummond properly (or at least in good faith) classified Plaintiff as an exempt employee not entitled to overtime. [133]. Plaintiff cross-moves for summary judgment, arguing that the record shows her job entitled her to overtime, and that Defendants have no good-faith defense for misclassifying her as exempt. [143]. She also separately moves to strike several of Defendant Barry's affirmative defenses. [140].

## II.    Legal Standard

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored

---

[2] The parties dispute whether Drummond "laid off" Plaintiff or fired her, [146] ¶ 1, but that dispute proves immaterial here.

information, affidavits or declarations, stipulations…admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). In resolving a motion for summary judgment, this Court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

In deciding a motion for summary judgment, a court must construe the record "in the light most favorable to the nonmovant" and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted), or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. Analysis

The FLSA requires employers to pay its employees one-and-a-half times their normal rate of pay for all hours worked over 40 hours per week. *See* 29 U.S.C. § 207. It contains exemptions for certain categories of employees, however, including "any employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1). Department of Labor regulations define this exemption to include several subcategories, including: (1) "administrative employees," 29 C.F.R.

5

§ 541.200; (2) "learned professionals," *id.* § 541.301(a); and (3) certain "highly compensated" employees, *id.* § 541.601. Additionally, even if an employer misclassifies an employee as exempt, the FLSA provides a complete bar to liability if the employer demonstrates that it relied in good faith upon "any written administrative regulation, order, ruling, approval, or interpretation" issued by the Wage and Hour Division of the United States Department of Labor (DOL). *See* 29 U.S.C. § 259.

The IMWL, Illinois' state-law counterpart to the FLSA, contains the same requirements with respect to overtime and incorporates the FLSA standards regarding exemptions. *See* 820 Ill. Comp. Stat. 105/4a(2)(E) (2016) (expressly incorporating the FLSA's exemption for bona fide executive, administrative, or professional employees). Thus, in determining if an exemption applies, courts interpret the overtime requirements under both acts in the same manner and if Plaintiff's "FLSA claims fail," then her "related state law claims under the IMWL must fail as well." *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 376 (7th Cir. 2005) (citing 820 Ill. Comp. Stat. 105/4a(2)(E).

An employer bears the burden of proof to establish that an employee falls under an exemption to the overtime requirement. *See Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 571 (7th Cir. 2012). Further, whether an employee qualifies for an exemption requires "a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Id.* at 572 (citing *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 870 (7th Cir. 2008)). In doing so, the regulations "must be given

6

a fair, not a narrow, reading." *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1052 (7th Cir. 2020) (citing *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018)).

## A.    Preliminary Matters Regarding the Factual Record

As a preliminary matter, the Court briefly addresses complaints both sides make about the form and substance of some of the evidence that the other side offers. [144] at 19–20; [157] at 8–17; [162] at 13–14, 19–21.

First, Plaintiff argues that some of Defendants' stated facts contradict prior statements or admissions, *see* [144] at 19, but these purported inconsistencies fail to withstand scrutiny.  For example, Plaintiff complains that Defendants admitted in their first answer that Drummond "was engaged in the business of building construction" and now inconsistently state that Drummond "is in the business of building construction to the extent Drummond is in the business of construction management, owner representation, and marketing."  [99] ¶ 11.  While the second statement certainly describes a narrower type of work within the umbrella of "building construction," she fails to explain how these statements pose a material inconsistency.

As another example, Plaintiff complains that statements in a declaration Defendant Barry submits are a "classic sham" because his declaration claims that Prairie Main LLC is "in the business of commercial rentals," yet he testified in his deposition that Prairie Main LLC is a "shared office concept." [144] at 19.  Here again, Plaintiff ignores that both statements could be true—"shared office concept" merely constitues  a  type  of  commercial  rental  arrangement.    Even  though  certain

disagreements exist as to the legal structures and interrelationships between Drummond, Barry and the LLCs, these issues fail to render Barry's various statements false or inconsistent.

Defendants, for their part, take issue with Plaintiff's response to Defendants' statement of facts. [157] at 9. Specifically, Defendants assert that Plaintiff violates Local Rule 56.1 by disputing Defendants' factual assertions without record citations or by relying upon inaccurate citations to the record. Not so. The Court has reviewed the paragraphs Defendant highlights, [146] ¶¶ 1–2, 5, 7-9, 11, 20, 22, 25, 27-28, 31–33, 38, 43–44, 46, 47, 49, 52, 56, 59, 61–62, 65, 75 and finds nothing amiss in Plaintiff's citations. While Defendant may dispute the import of particular facts or have a different interpretation of some of the materials Plaintiff cites, such disputes provide no grounds to strike Plaintiff's responses.

Defendants also seek to strike some of Plaintiff's evidence as inadmissible hearsay. For example, they take issue with certain emails, Plaintiff's handwritten meeting notes, [145-3], a flowchart showing the contract approval process, *id.*, Defendants' own answers to Plaintiff's interrogatories, [145-5], and Plaintiff's Excel documents tracking her hours, *id.*, among others.

This argument lacks merit. While Federal Rule of Civil Procedure 56(c)(2) permits an opposing party to object if "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Plaintiff need only offer material that *can be* presented in a form admissible at trial. The material need not be presented in such a form on the motion for summary judgment itself. *See*

8

*Waldridge*, 24 F.3d at 921 & n.2. Defendants fail to establish that the hearsay evidence Plaintiff offers "cannot be presented" in any admissible form. Thus, the Court will not strike it or disregard it on that basis.

Overall, the parties have not established a basis for the Court to strike any statements of fact or responses. Instead, the issues the parties highlight largely relate to bona fide factual disputes or ambiguities in the record. To the extent these prove material, the Court will address them below. The Court now proceeds to the merits of the parties' arguments.

### B.     FLSA Administrative Exemption

Defendants' motion for summary judgment argues that Plaintiff's job qualified for multiple exemptions, but they principally rely upon the administrative exemption. [134] at 10–23. Thus, this Court starts there.

The FLSA provides an exemption to the overtime pay requirement for certain "bona fide" administrative employees. *See* 29 U.S.C. § 213(a)(1). The DOL regulations define that subset of employees to include any employee: (1) "Compensated on a salary or fee basis" of not less than a defined statutory minimum; (2) "Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (3) "Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The DOL regulations also define "primary duty" as "the principal, main, major or most important duty that the employee performs." *Id*.

§ 541.700(a). In deciding an employee's "primary duty", the regulations instruct that one must consider "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.*

Here, the parties do not dispute that Plaintiff's job met the salary requirement. [146] ¶ 17. They dispute, however, the second and third requirements. Namely, they dispute how to characterize the nature of Drummond's business and whether that has legal implication for the second requirement. [144] at 18–20; [157] at 18–26; [162] at 13–16. In addition, while they agree about some of Plaintiff's duties and responsibilities, they disagree on how to describe the nature of her job, particularly as to how much autonomy and discretion she possessed. [134] at 10–23; [144] at 11–24. The Court considers these arguments below, looking at the two requirements in turn.

### 1. Requirement Two: Primary Duties Directly Related to Management or General Business Operations

The second requirement of the administrative exemption requires that the employee's "primary duty" comprise "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). Here, Plaintiff agrees that her primary duties were non-manual. [146] ¶ 71 (acknowledging that she spent only about two hours a week doing "manual labor," some of which involved "keeping the jobsite safe"). Thus, the Court's analysis focuses on whether Plaintiff's work "directly related to the management or general business operations" of Drummond or its clients.

The regulations list numerous categories of duties that frequently qualify for this exemption, including "quality control," "procurement," "safety and health," "budgeting," "auditing," "personnel management," and "legal and regulatory compliance." 29 C.F.R. § 541.201(b). But the regulations also emphasize that these merely constitute examples, and duties may still qualify even if they do not fall into one of the enumerated categories. *Id*. The regulations explain that the focus should rest on whether the duties involve "the running or servicing of the business" (which would satisfy the second requirement) or relate to "work such as laboring 'on a manufacturing production line or selling a product in a retail or service establishment.'" *Eli Lilly*, 679 F.3d at 574 (quoting 29 C.F.R. § 541.201(a)). This distinction, often referred to as the administrative/production dichotomy, derives from traditional manufacturing and sales settings. *See Eli Lilly*, 679 F.3d at 574 n.22. In those setting, an employee who works on the manufacturing line or who sells an employer's products would not qualify as administratively exempt, whereas an employee tasked with keeping the business running and in good order may.

Here, Plaintiff argues that her duties went to the core of Drummond's business—which she describes as the business of constructing buildings—and therefore her duties fall on the "production" side of the administrative-production dichotomy. [144] at 18–20.

Defendants disagree. First, they note that Drummond only worked in construction insofar as it managed construction projects for its clients. [146] ¶ 2; [157] at 23–25. Second, they argue that employees may qualify as administratively

exempt if their primary duties relate to the management or general business operations of the employer or *the employer's customers*. [157] at 26. Defendants argue that the core business of Drummond's clients—the LLCs that owned the properties—was the business of real estate leasing, not construction. [146] ¶ 4. Thus, Defendants argue, Plaintiff's primary duties managing construction projects remain ancillary to the clients' core business. *Id*. Third, they argue that even if one describes Drummond's core business as constructing buildings, "Plaintiff provided project management services, which are ancillary to the building of buildings." [157] at 18.

As Defendants correctly emphasize, the administrative exemption explicitly states that it applies to employees whose primary duties directly relate "to the management or general business operations of the employer *or the employer's customers*." 29 C.F.R. 541.200(a)(2) (emphasis added). As Defendants also point out, Plaintiff agrees that the LLC clients were not in the business of constructing buildings. [146] ¶ 4. At first blush, such facts would seem to resolve the matter in Defendants' favor since, by Plaintiff's own description of Drummond's business, her duties related to overseeing the construction of buildings for clients and she agrees that construction is not the clients' core business.

Plaintiff insists, however, that, although the LLCs were not in the construction business, they also were not in the business of "leasing building space" as Defendants contend. [144] at 20. Rather, Plaintiff argues that the LLCs were "not even in business" at all, but merely shell-companies formed by Barry and his fellow real estate investors. *Id*. In other words, according to her, the LLCs had neither general

12

business operations nor a core business. She argues that because Drummond's clients had no business at all, the Court should only look at whether her primary duties "directly related to the management or general business operations" of Drummond. *Id*. at 18–20.

The record includes factual disputes about whether Drummond's LLC clients were merely shell companies as Plaintiff argues, or in the business of "leasing building space" as Defendants argue. For example, while Defendant Barry claims in a declaration that Prairie Main LLC began leasing the building space in 14 Main Street after the renovations, [146] ¶ 4, his deposition testimony suggests that 14 Main Street's tenants were only his fellow investors in the property, [135-4] at 12:12–17:4. The LLC can hardly be in the business of "leasing building space" if it leases space only to its owners.

Further, Defendant Barry's own testimony indicates that he created Drummond as part of a broader venture to invest in real estate with others. Thus, the term "customers" as used in the regulation may not even apply to the LLCs. The regulations provide two examples for employees whose primary duties may relate to the general business operations of a customer: tax experts and financial consultants, acting as advisors or consultants to their employer's clients or customers. 29 C.F.R. 541.201(c). These examples illustrate typical consulting firm scenarios in which the firm is a wholly distinct entity from the clients it services. That is not Drummond's relationship with its LLC clients. Given these factual disputes, Defendants are not entitled to summary judgment based upon this theory.

13

Defendants' arguments about Drummond's core business and Plaintiff's duties within it, however, fare much better. [134] at 12–19; [157] at 23–25. On this, Plaintiff insists that Drummond's core business was "construction" and her work directly related to that core business. [144] at 11–18. Relying on her reading of the administrative-production dichotomy, she argues that she necessarily falls squarely on the side of "production." *Id.* The Court disagrees.

The Seventh Circuit has held that the administration/production dichotomy remains an analytical tool for evaluating this requirement, but it is "not determinative unless an employee is engaged unequivocally in production." *Eli Lilly*, 679 F.3d at 574 n.22. The court set out more fully its reasoning in *Verkuilen v. MediaBank, LLC*, where it explained that the administrative/production dichotomy often leaves an analytical gap for "employees who don't perform work directly related to assisting with the running or servicing of the employer's or its customers' business but are not necessarily employees" working "on an assembly line or work in a retail store as a salesperson." 646 F.3d 979, 981 (7th Cir. 2011).

*Verkuilen* involved FLSA claims by an account manager who worked for a company that developed and sold sophisticated computer software to advertising agencies. *Id.* at 980. In the account manager role, the plaintiff worked with the customers to determine their needs and then coordinated with the company's software developers to customize the software to meet those needs, ensure that the final product ultimately met the customer's needs, and troubleshoot and make modifications along the way. *Id.* at 981. The court held that the plaintiff "is a

14

picture-perfect example of a worker for whom the" FLSA's "overtime provision is not intended." *Id*. It emphasized that, even if the plaintiff's work related to the company's core business (*i.e.* development and sale of sophisticated software), the account manager "is not a salesman for Best Buy or a technician sitting at a phone bank fielding random calls from her employer's customers." *Id*. at 982. The court emphasized the plaintiff's broad role relating to the customers she served—including working with them to identify their software needs, developing specifications, troubleshooting issues, and overseeing testing for a customers. *Id*. Given these types of responsibilities, the court held that her "primary duty was directly related to the general business operations both of her employer and (as in a consulting role) of the employer's customers." *Id*.

*Verkuilen* illustrates that, even if an employee's duties ultimately relate in some way to the employer's core business, that does not mean the employee necessarily falls on the "production" side of the dichotomy. Instead, for many industries, one must look more closely at the breadth, depth, and complexity of the duties the employee performed to determine if they "directly related to the management or general business operations of the employer or the employer's customers."

Here, Plaintiff agrees that she had "general control" over a project worksite, [146] ¶ 53, and the undisputed portions of the record confirm such control. She scheduled when the subcontractors worked, communicated with tradespeople, and updated them when changes arose. *Id*. ¶ 46. Plaintiff coordinated the timing of each

trades' work in relation to the overall project. *Id.* ¶¶ 46, 47, 53. She was responsible for "managing projects within a budget and getting them done on time." *Id.* ¶ 23. She had the authority to ask people to leave—either for scheduling reasons or because of safety concerns. *Id.* Among other things, Plaintiff also monitored the workplace for safety, including "discussing safety on the jobsite, ensuring that subcontractors were following safety protocols including enforcing PPE use, and completing incident reports." *Id.* ¶ 54. Plaintiff also agrees that she inspected subcontractors' work to ensure it met the scope of work agreements and the drawings provided by architects and engineers. *Id.* ¶ 23. When workers came to her with questions about discrepancies between drawings and field conditions, conflicting interpretations of drawings, or conflicts between tradesmen, she would determine next steps for resolution. *Id.* ¶¶ 34, 43. Further, she drafted scope of work agreements for some subcontractors, *id.* ¶ 31, and she worked with prospective contractors during the bidding process. According to her own account, she "compared bids received from tradespeople to drawings and the scope of work and would work with trades until she thought the bids matched the drawings and scope of work." *Id.* ¶ 38. Although she argues that she did not make the final decisions on whose bid to accept (she claims that another employee, Joe Marrese, or Defendant Barry made those decisions), she agrees that she gave them "an opinion" on her "interactions" with the prospective subcontractors and "perception of who might be a good or bad fit for the work."[3] *Id.*

Just as the account manager in *Verkuilen* had broad duties that directly

---

[3] The parties dispute whether Barry himself supervised Plaintiff directly, or whether Joe Marrese functioned as her direct supervisor. [146] ¶ 27. This dispute proves immaterial to the Court's analysis.

related to meeting customer needs and thus ensuring the success of the company's "general business operations," so too did Plaintiff's broad duties managing large construction projects directly relate to Drummond's "management" and "general business operations."

Ostensibly, the DOL would agree since it offered a similar opinion in a 2018 Opinion Letter about whether a "project supervisor in the residential homebuilding industry" qualifies as exempt under the FLSA's administrative exemption. *See* DOL Opinion Letter FLSA2018-10, 2018 WL 405231 (Jan. 5, 2018). In this letter, the DOL noted that the company that sought the opinion usually outsources the actual construction to various subcontractors and the project supervisor serves as "the company's representative at the worksite in dealings with subcontractors, suppliers, customers, and government inspectors." *Id.* The DOL letter also listed numerous tasks the project supervisor performed including: (1) ensuring homes are ready for inspection; (2) interacting with building inspectors; (3) inspecting work of subcontractors and suppliers; (4) tracking costs against budgets; (5) acting as the company's safety inspector; and (6) responding if an accident occurs. *Id.* Based on these described tasks, the DOL concluded that the project manager's primary duties "directly related to the management or general operations of the employer" (and, as relevant to the regulations' third requirement discussed below, it also found that the duties evinced discretion and independent judgment on significant matters). The DOL emphasized that the "overwhelming majority" of the "work is non-manual" and the project supervisor spends "more than half his/her time directing, managing,

17

scheduling, and paying subcontractors and suppliers" and "evaluates the quality and efficiency of the subcontractors' and suppliers' work, is authorized to stop their work to correct any observed deficiencies, and may require them to remove any of the employees from the worksite." *Id.* It also noted that the project supervisor reviews construction plans to ensure they align with the actual construction; ensures the home meets safety, quality and legal requirements and is ready for inspection; and negotiates solutions when issues arise with an inspector, subcontractor, or supplier. All of this, the DOL concluded, showed the project supervisor's primary duties "directly related to the management or general operations of the employer." *Id.*

The project supervisor's duties described in the DOL letter bear marked similarities to the duties that Plaintiff agrees she performed for Drummond. While Agency opinions letters such as these are not subject to *Chevron* deference, "interpretations contained in formats such as opinion letters are 'entitled to respect'" insofar as "those interpretations have the 'power to persuade.'" *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). For all the reasons discussed above, the DOL letter comports with the Court's interpretation of the second requirement and confirms that Plaintiff's duties directly related to the "management or general business operations" of Drummond.

Viewing the evidence in the light most favorable to Plaintiff, the record confirms that Plaintiff's acknowledged duties directly related to "the management or general business operations" of Drummond as that requirement is interpreted by the Seventh Circuit.

### 2. Requirement 3: Exercise of Discretion and Independent Judgement Regarding Matters of Significance

Defendant also must establish the third requirement for the administrative exemption: that Plaintiff's primary duties "include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Exercising discretion and using independent judgment "implies that the employee has authority to make independent choice, free from immediate direction or supervision. *Id*. § 541.202(c). Importantly, however, an employee's job may satisfy this qualification "even if their decisions or recommendations are reviewed at a higher level." *Id*. Further, the discretion and independent judgment must "be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id*. § 541.202(e). Instead, it should involve "comparison and evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." *Id*. § 541.202(a).

To help guide analysis of this requirement, the DOL regulations provide an illustrative, non-exhaustive, list of factors to consider:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is

19

> involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b). The Seventh Circuit has emphasized that these factors are "not a checklist," but a "guide" and "that the determination of discretion is a circumstance-specific one that will look different from industry to industry and position to position." *Eli Lilly*, 679 F.3d at 582.

Defendants argue that Plaintiff's primary duties involved "managing the job site, scheduling, managing, overseeing contractors" and this meant ensuring the subcontractors and tradesmen completed the project on schedule, within budget, and according to the client's wishes. [134] at 9. They insist her duties included drafting some scope of work forms; finding potential contractors to bid for assignments; walking the job site to answer questions and review whether work conformed with construction plans; reviewing bids and making recommendations on hiring and large change orders; updating and managing work schedules; approving purchase orders; and managing jobsite safety among other things. *Id.*

In response, Plaintiff concedes that her primary duties encompassed two of the regulation factors: (1) carrying out major assignments in conducting the operation of the business; and (2) performing work that affected the business operations to a substantial degree. [144] at 22–23. But she disputes whether the duties she performed involved sufficient discretion or autonomy to satisfy the requirement. She also disputes some of Defendants' contentions about her duties and discretion. For example, she insists that the employee previously in her role did some of the work

20

that they claim she did. [144] at 21. She also disputes, for example, whether: (1) Joe Marrese supervised her, [146] ¶ 9; (2) she needed approval to send a project out to bid, finalize a scope of work document she prepared, or make a large purchase order, *id.* ¶¶ 27, 31, 38; (3) she could independently choose which subcontractors to hire, *id.* ¶¶ 27, 58; and (4) she was always the sole Drummond representative onsite, *id.* ¶ 28.

Putting aside those disputes—since they constitute factual disputes that the Court cannot resolve at this stage—Plaintiff's own account of her duties (as outlined in the section above) proves that she exercised discretion and independent judgment on significant matters. For example, she exercised discretion on when to raise issues about possible specification changes, what information to gather on those changes, and which experts she needed to consult on issues. Further, even if she did not select which contractors to hire, she worked on obtaining, developing and vetting their bids, and then gave her supervisors "an opinion of" her "interactions" with the prospective contractors and her "perception of who might be a good or bad fit for the work.'" [146] ¶ 38. Further, she admits that she had discretion to determine who worked and when; to dismiss workers for work safety reasons; and to prepare scope of work contracts (at least on smaller projects). She also evaluated whether the work conformed to specifications, determined when projects were ready for government inspection, and prepared for the inspections.

Plaintiff makes multiple arguments regarding why these duties do not suffice. First, she argues that "project management" is a "generic job *title*" that gives no insight into her "primary duties." [144] at 14, 23. She insists that she primarily

21

worked as a "field superintendent" and spent at least 80 percent of her time "organizing and inspecting the work of trade contractors on construction sites." [144] at 23. She argues that she only occasionally worked on bids, purchase orders, or scope of work contracts. *Id*.

To be sure, an employee's job title does not control the analysis. Instead, the regulations require "a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Bigger*, 947 F.3d at 1052 (quoting *Eli Lilly*, 679 F.3d at 572). The regulations also define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). But the regulations also state that, while the "amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," time spent on various work "is not the sole test." 29 C.F.R. § 541.700(b).

Here, Plaintiff confuses "duty" with "task." An employee's primary job duties frequently involve numerous tasks and, naturally, an employee may perform some of those tasks more frequently than others. But that does not mean that the person's "primary duty" is the task most frequently completed. Such a rule would draw too narrow a box around an employee's job. It comes as no surprise that Plaintiff's work required her to inspect the job sites and organize workers more frequently than she worked on contractor bids, scope of work agreements, or purchase orders. The former tasks by their nature would require more frequent attention. In short, the record and Plaintiff's own testimony confirm that the lesser-performed tasks were nonetheless

part of her primary duties.

Next, Plaintiff argues that her duties only required her to use "well-established techniques and procedures" to determine if others performed work as required. [144] at 15 (quoting 29 C.F.R. § 541.203(g)). She also argues that she did not exercise discretion or independent judgment because she had no discretion to create or modify project specifications and had to get approval from her superiors on significant decisions. [144] at 22.

True, the Seventh Circuit noted in *Roe-Midgett v. CC Services, Inc.* that employees do not exercise "discretion or independent judgment for purposes of the administrative exemption" if they merely "grade, classify, or otherwise determine whether specific standards are" met. 512 F.3d 865, 873 (7th Cir. 2008). But the court also emphasized that "independent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines." *Id*; *see also Kennedy*, 410 F.3d at 374–75 (holding that a group of nuclear power plant employees exercised discretion and independent judgment even if they had to follow "a highly regimented set of rules"). Further, the regulations explicitly state that an employee's duties may evince discretion "even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). And discretion includes "recommendations for action rather than the actual taking of action." *Id*.

Many industries have rules and guidelines that employees and companies must follow, and the construction industry certainly is no exception. The parties agree that the construction projects that Plaintiff worked on were major building

updates that required the expertise of engineers and architects. Thus, it also comes as no surprise that Plaintiff had to follow site plans and specifications and work within the confines of construction codes and other strict policies and rules. And not being an engineer or architect, she necessarily had to consult with those who had such expertise.

Such standards fail to undermine the fact that her job required exercising discretion and independent judgment. To the contrary, as the court noted in *Verkuilen*, "below the highest executive level a modern business is a congeries of specialists" and there will always be functions that a plaintiff "did *not* perform." 646 F.3d at 983. Here, subcontractors consulted with Plaintiff when they had questions or disagreements about the site plans or believed field conditions made the plans infeasible. She had responsibility to resolve these issues by gathering information to present "to engineers, architects, designers, or one of her supervisors for decision." [146] ¶ 34. Even if she did not make the final decision, she still had to use discretion to determine whether an issue required escalation and, if so, who she needed to consult and what information to gather. Similarly, even if Plaintiff did not select which contractors to hire, she worked on obtaining, developing and vetting bids, and then gave her supervisors "an opinion of" her "interactions" with the prospective contractors and "sort of perception of who might be a good or bad fit for the work.'" [146] ¶ 38. She also determined who worked and when; could dismiss workers for work safety reasons; and prepared some scope of work contracts. Such responsibilities all show "discretion and independent judgment with respect to

matters of significance." 29 C.F.R. § 541.200(a).

Finally, as applicable to both Requirements 2 and 3, Plaintiff urges the Court to follow *Gottlieb v. Constr. Servs. & Consultants, Inc.*, a case in which the court found that a "project supervisor" for a company that constructed building shells (*i.e.* the foundation, exterior walls, and roofs) did not qualify as an administrative employee. No. 05-14139-CIV, 2006 WL 5503644 (S.D. Fla. July 24, 2006).

Plaintiff's citation to this case, however, presents limited value here because whether an exemption applies remains a "fact-intensive analysis" of each employee's "employment duties and responsibilities." *Eli Lilly*, 679 F.3d at 572. The employee's duties in *Gottlieb* illustrate this point. There the employee performed a significant amount of manual work to help complete the projects, such as pouring concrete, moving materials and equipment, cleaning up the sites. 2006 WL 5503644, at *3. Plaintiff, in contrast, agrees she generally did no more than two hours of "manual" work at the site per week. [146] ¶ 71. Next, some of the *Gottlieb* employee's tasks appear similar (such as scheduling subcontractors and inspecting construction-site safety), but the projects the *Gottlieb* employee worked on were far smaller in scale and complexity than the ones presented here. 2006 WL 5503644, at *2–3.

Further, in *Gottlieb*—which is non-binding on this Court— the court did not apply the Seventh Circuit's more nuanced view of the administrative/production dichotomy. Instead, it found that the employee fell on the "production" side merely because his "work involved producing the product" the company "existed to market." *Id.* at *6. *Gottlieb* is thus of little use, as this Court must apply the regulations as

interpreted by the Seventh Circuit, not a Florida district court.[4]

Finding the three prongs of the administrative exemption satisfied, the Court holds that there exists no genuine dispute that Plaintiff was an exempt administrative employee under the FLSA.[5] Because her FLSA claim fails for this reason, her "related state law claim under the IMWL must fail as well" as to both Defendants. *Kennedy*, 410 F.3d at 376.[6]

## C.    Plaintiff's Motion to Strike

Finally, the Court turns to Plaintiff's motion to strike. Plaintiff seeks to strike nine of Defendant Barry's affirmative defenses, arguing that only the white-collar exemption defenses merit consideration on summary judgment or at trial. [140]. Finding summary judgment in both Defendants' favor on the affirmative defense Plaintiff did not move to strike, the Court denies Plaintiff's motion as moot.

---

[4] Finally, the 2018 DOL Letter discussed above acknowledged the *Gottlieb* decision and noted that its findings "demonstrate that the application of these requirements is highly fact specific." 2018 WL 405231. As previously discussed, the Court finds the 2018 DOL Letter's opinion and interpretation of the administrative exemption persuasive, and "entitled to respect." *Christensen*, 529 U.S. at 587.

[5] Defendants also raised other affirmative defenses, namely that Plaintiff also qualifies for the "highly compensated employee" and "learned professional" exemptions. They also argue that, even if Plaintiff does not qualify as exempt, they classified her as exempt in "good faith." [134] at 23–27. Based upon the record, Defendants face factual and legal hurdles to these alternative arguments. *See* 29 C.F.R.§ 541.601; [146] ¶¶ 17, 74–76; 29 C.F.R. 541.301; 29 U.S.C. § 259. The Court need not consider these alternative affirmative defenses, however, because Defendants have established as a matter of law that Plaintiff was exempt pursuant to the administrative exemption.

[6] Defendant Barry, a non-diverse defendant, also argued that, if the Court does not find that an exemption applies as a matter of law, then the Court should decline to exercise supplemental jurisdiction over the IMWL claim against him. [134] at 9–10. He agrees, as he must, that the Court has jurisdiction over the IMWL claim against him, but merely argues that the Court has the power to decline supplemental jurisdiction over state law claims on a party-by-party basis pursuant to 28 U.S.C. § 1367. *Id.* Because the Court finds an exemption applies, which resolves all claims against all Defendants in their favor, the Court need not consider Defendant Barry's alternative request.

**IV.    Conclusion**

For the reasons set out above, the Court grants Defendants' motion for summary judgment [133] and denies Plaintiff's motion for summary judgment [143]. The Court also denies Plaintiff's motion to strike [140].

Date: September 30, 2022                    Entered:

_____
John Robert Blakey
United States District Judge